IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

LEE SARTIN TRUCKING, INC.,

        Plaintiff,

v.                                         CIVIL ACTION NO.  2:22-cv-00326

SOUTHEASTERN LAND, LLC, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Southeastern Land, LLC's ("Southeastern") Motion to Dismiss, or In the Alternative, Motion to Compel Arbitration and Stay (ECF No. 7). For the reasons more fully explained below, the Court **GRANTS** Southeastern's Motion to Compel Arbitration, (ECF No. 7), and **ORDERS** that the case be **STAYED**.

                      I.      BACKGROUND

Lee Sartin Trucking, Inc. ("Lee Sartin") is a West Virginia trucking corporation. (ECF No. 1-1 at 1, ¶ 1.) Southeastern is a Kentucky limited liability company in the business of mining coal. (*Id.* at 1, ¶ 2.) The two entered into a written contract ("the contract") on August 2, 2016, wherein the parties agreed that Lee Sartin would haul coal for Southeastern and, in exchange, Southeastern would pay $3.25 per ton of coal hauled. (ECF No. 7-1 at 2, ¶ 3.) The contract contained an arbitration clause that provides, in pertinent part, that

1

> [a]ny disagreement or dispute between [Lee Sartin and Southeastern] as to the performance or non-performance of any provision [of the contract] shall be submitted to arbitration at the option of [Southeastern]. . . . Any such arbitration shall be conducted pursuant and subject to the jurisdiction of [the Federal Arbitration Act].

(*Id.* at 8–9, ¶ 16.) Lee Sartin then performed under the contract, hauling coal for Southeastern from approximately March, 2020, to October, 2021. (ECF No. 1-1 at 2, ¶ 6.) Southeastern, however, never paid. (*Id.* ¶ 9.)

Lee Sartin alleges Southeastern's nonpayment was part of a larger scheme to defraud. (*Id.* at 2–7, ¶¶ 12–42.) Suffice it to say that, according to Lee Sartin, Southeastern and its codefendant, C&B Construction Company, LLC, ("C&B")[1], entrenched themselves in a complex business arrangement, the purpose of which was two-fold. (*Id.*) First, this scheme allegedly allowed the companies to report tax losses on their year's end filings. (*Id.* at 3, ¶ 17.) Second, and relevant here, the scheme also enabled "money [to flow] from one company to another without allowing the . . . assets to be placed at risk for failure to pay monies owed to vendors," such as Lee Sartin. (ECF No. 14 at 4.)

Realizing its prospects of payment were poor, Lee Sartin filed suit against Southeastern and C&B in the Circuit Court of Mingo County on June 30, 2022. (ECF No. 1-1.) The complaint asserts claims for (1) breach of contract; (2) fraud, both actual and constructive; (3) civil conspiracy to commit fraud; (4) a declaratory judgment; and (5) quantum meruit. (*Id.*) Southeastern and C&B thereafter removed this action to this Court on August 5, 2022, invoking diversity jurisdiction pursuant to 28 U.S.C. § 1332. (ECF No. 1.) On August 19, 2022, Southeastern filed its Motion to Dismiss, or In the Alternative, Motion to Compel Arbitration and Stay. (ECF No. 7.) Lee

---

[1] Lee Sartin sued C&B as "C&B Construction, LLC," (ECF No. 1-1 at 1, ¶ 3.), but C&B's Motion to Dismiss states this is incorrect, as its true name is C&B Construction Company, LLC. (ECF No. 4 at 1.)

Sartin responded on August 30, 2022. (ECF No. 14.) Southeastern did not reply. The matter is now ripe for adjudication.

## II. GOVERNING LAW

Section 2 of the Federal Arbitration Act ("FAA") "is the primary substantive provision of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Section 2 provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Enacted "to reverse the longstanding judicial hostility to arbitration agreements," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991), § 2 thus "places arbitration agreements on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006), by "requir[ing] courts to enforce arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415, 203 L. Ed. 2d 636 (2019) (internal quotation marks omitted) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. ––––, 138 S. Ct. 1612, 1621, 200 L. Ed. 2d 889 (2018)).

Courts have long interpreted the FAA as "reflect[ing] 'a liberal federal policy favoring arbitration agreements.'" *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (quoting *Moses H. Cone*, 460 U.S. at 24); *see, e.g.*, *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir. 1996) ("[T]he Supreme Court has announced its healthy regard for the federal policy favoring arbitration.") (internal quotation marks omitted). Thus, although courts now enforce arbitration agreements "accord[ing] [to] their terms," *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989), "any doubts concerning the

3

scope of arbitrable issues should be resolved in favor of arbitration." *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292 (4th Cir. 2020) (quoting *Moses H. Cone*, 460 U.S. at 24–25).

Section 3 entitles "litigants already in federal court to invoke [arbitration] agreements made enforceable by § 2." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009). Litigants do so by moving the Court "to stay judicial proceedings involving issues covered by written arbitration agreements." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709 (4th Cir. 2001). Section 3 thus requires courts "to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Adkins*, 303 F.3d at 500. In other words, the "stay-of-litigation provision is mandatory." *Id.* Litigants wishing to compel arbitration under the FAA must prove

> (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

*Adkins*, 303 F.3d at 500–01 (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)). Here, Lee Sartin disputes the second element, claiming the arbitration clause is illusory and therefore unenforceable.

### III. DISCUSSION

Because arbitration "is a matter of consent, not coercion," *Volt*, 489 U.S. at 479, the Court must complete a two-step inquiry before compelling arbitration. *Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 179 (4th Cir. 2013). The Court first applies West Virginia contract law to determine whether the parties agreed to arbitrate their disputes. *Id.* (applying "ordinary state law principles governing the formation of contracts, including principles concerning the 'validity, revocability,

4

or enforceability of contracts generally.'") (quoting *Hill v. PeoplesoftUSA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005)); *see also Mey*, 971 F.3d at 288 ("As with any contract, we must first be satisfied that an agreement to arbitrate has been formed. We resolve this question according to state law principles governing contract formation."). If so, the Court then applies the "federal substantive law of arbitrability," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone*, 460 U.S. at 24), to determine "whether [the] arbitration agreement encompasses [this] dispute." *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 319 (4th Cir. 1988). If the answer to both of these questions is "yes," the Court must compel arbitration. *Muriithi*, 712 F.3d at 179.

### A. The arbitration clause is not illusory

"The elements of a contract are an offer and an acceptance supported by consideration." *Dan Ryan Builders, Inc. v. Nelson*, 737 S.E.2d 550, 556 (W. Va. 2012); Syl. Pt. 5, *Virginian Exp. Coal Co. v. Rowland Land Co.*, 131 S.E. 253 (W. Va. 1926) ("The fundamentals of a legal contract are competent parties, legal subject–matter, valuable consideration, and mutual assent.") (internal quotation marks omitted). Consideration is broadly defined as "some right, interest, profit, or benefit accruing to one party, or some forebearance, detriment, loss, or responsibility given, suffered, or undertaken by another." *First Nat'l Bank of Gallipolis v. Marietta Mfg. Co.*, 153 S.E.2d 172, 177 (W. Va. 1967). "A benefit to the promisor or a detriment to the promisee is sufficient consideration for a contract." *Id.* But a promise that "does not actually bind or obligate the promisor to anything" is illusory and cannot be consideration. *Hill*, 412 F.3d at 543; *Illusory Promise*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An illusory promise typically, by its terms, makes performance optional with the promisor.").

5

Lee Sartin takes issue with the arbitration clause, arguing it is illusory and therefore unenforceable.[2] (ECF No. 14 at 11–12.) Specifically, Lee Sartin notes that the obligation to arbitrate is non-binding on Southeastern because Southeastern may "pick and chose (sic) which claims are arbitrated." (*Id.* at 11.) Since Southeastern has the *option* to arbitrate disputes, Lee Sartin would have this Court believe the clause is illusory. (*Id.* at 11–12.)

*Dan Ryan* dooms this argument. There, the Supreme Court of Appeals of West Virginia considered near-identical language: the arbitration clause at issue "reserved [to the party seeking arbitration] the right to seek arbitration *or* to file an action for damages." *Dan Ryan*, 737 S.E.2d at 553 (emphasis in original). The party resisting arbitration argued the arbitration clause lacked consideration because the party seeking arbitration had reserved the option to go to court. *Id.* at 556. The *Dan Ryan* Court rejected this argument, holding "that the formation of a contract with multiple clauses only requires consideration for the entire contract, and not for each individual clause." *Id.* at 288–89. Because the arbitration clause was in a 56-page "contract [that] as a whole [was] supported by valuable consideration," it was valid and enforceable. *Id.* at 284, 288.

The same is true here. Although this arbitration clause does not bind Southeastern, it appears in a "contract [that] as a whole is supported by valuable consideration." *Id.* at 288. The parties entered into a 10-page, 23-paragraph commercial contract containing many promises and

---

[2] Lee Sartin also half-heartedly argues that it would be unfair to enforce the arbitration agreement because Southeastern did not sign it. (ECF No. 14 at 12) ("[Southeastern] now seeks to enforce an agreement that it did not even sign.") But this ignores "[t]he rules of contract formation [that] are taught in the first weeks of law school." *SWN Prod. Co. v. Kellam*, 875 S.E.2d 216, 234 (W. Va. 2022) (Hutchison, C.J., concurring). While "mutuality of assent is an essential element of all contracts," it may be shown in any number of ways. *Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450 (W. Va. 1993). Here, Southeastern made an offer to Lee Sartin by offering the terms contained in its company contract; Lee Sartin accepted the terms by signing the same. This demonstrates the "meeting of the minds" necessary to create a contract, *Chesapeake Appalachia, L.L.C. v. Hickman*, 781 S.E..2d 198, 216 (W. Va. 2015), and Southeastern has every right to enforce the parties' agreement. *See, e.g.*, *Mey*, 971 F.3d at 295 (enforcing an arbitration agreement contained in a contract signed only by the party resisting arbitration).

covenants that benefits and binds both parties. (*See* ECF No. 7-1.) For example, Lee Sartin promised to haul Southeastern's coal. (*Id.* at 2, ¶ 4.) In exchange, Southeastern promised to pay Lee Sartin $3.25 per ton of coal hauled. (*Id.*) Lee Sartin promised to indemnify Southeastern in certain situations. (*Id.* at 5–6, ¶ 7.) Southeastern allowed Lee Sartin's employees to claim statutory liens against it for unpaid wages. (*Id.* at 2, ¶ 3.) The Court will not belabor the point—because the contract here is supported by ample consideration, the arbitration agreement is enforceable.

### B. Lee Sartin's claims fall within the scope of the arbitration clause

Arbitration "is a way to resolve those disputes—but only those disputes—that the parties have agreed to . . . arbirat[e]." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Although "[a] party cannot be required to submit to arbitration any dispute which he has not agreed" to arbitrate, *Mey*, 971 F.3d at 292, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone*, 460 U.S. at 24. "The 'heavy presumption of arbitrability [therefore] requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.'" *Mey*, 971 F.3d at 292 (quoting *Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011)). Put differently, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T Techs., Inc. v. Comms. Workers of Am.*, 475 U.S. 643, 650 (1986)). The Court must look beyond "the legal label assigned to the claim" to determine "whether the factual allegations underlying the claim are within the scope of the arbitration clause." *J.J. Ryan & Sons*, 863 F.2d at 319.

7

Southeastern argues that the arbitration clause covers each of Lee Sartin's claims and the case must therefore be arbitrated. (ECF No. 7 at 2–4.) Lee Sartin does not dispute this point. (*See* ECF No. 14.) The Court agrees with Southeastern.

Here, the arbitration clause covers "[a]ny disagreement or dispute between [Lee Sartin and Southeastern] as to the performance or non-performance" of the contract. (ECF No. 7-1 at 8–9, ¶ 16.) All five of Lee Sartin's claims easily fall within the clause's ambit. The breach of contract claim goes to performance itself, i.e., did Southeastern uphold its end of the bargain? *Sneberger v. Morrison*, 776 S.E.2d 156, 171 (W. Va. 2015) ("A claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, and resulting damages."). The request for declaratory judgment is no different: it asks for a ruling that Southeastern must pay Lee Sartin pursuant to the contract. (ECF No. 1-1 at 8, ¶ 51.) The fraud and conspiracy claims fare no better. Fraud requires a showing that Southeastern fraudulently induced Lee Sartin's performance; the civil conspiracy claim requires Lee Sartin show that Southeastern and C&B acted together in doing so. (*Id.* at 9–10, ¶¶ 63, 65–69.) The quantum meruit claim, despite the equitable "label assigned to" it, *J.J. Ryan & Sons*, 863 F.2d at 319, is covered by the arbitration clause because it, too, relates to Lee Sartin's contractual performance. Indeed, Lee Sartin would have to prove "that the [coal haul] services at issue were *performed* under such circumstances . . . that [Lee Sartin] reasonably expected to be paid for such services." *Copley v. Mingo Cnty. Bd. of Educ.*, 466 S.E.2d 139, 146–47 (W. Va. 1995) (emphasis added). At bottom, Lee Sartin's claims are certainly "susceptible of an interpretation that [the arbitration clause] covers [each]," and "[t]he heavy presumption of arbitrability requires that" this case goes to arbitration. *Mey*, 971 F.3d at

292. The Court therefore **GRANTS** Southeastern's Motion to Compel Arbitration, **STAYS** the case pending arbitration, and **REMOVES** this case from the active docket of the Court.

    **IT IS SO ORDERED**.

    The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

    ENTER:    December 8, 2022

_____
THOMAS E. JOHNSTON, CHIEF JUDGE